Daniel C. Girard (SBN 114826)
Jordan Elias (SBN 228731)
Adam E. Polk (SBN 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
*dgirard@girardsharp.com*
*jelias@girardsharp.com*
*apolk@girardsharp.com*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOUXIANG EILEEN WANG and BIYUN ZONG, on behalf of themselves and all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| LIFE INSURANCE COMPANY OF THE SOUTHWEST; NATIONAL LIFE INSURANCE COMPANY; PREMIER FINANCIAL ALLIANCE, INC.; MEHRAN ASSADI; HERMIE BACUS; DAVID CARROLL; STEVEN G. EARLY, BILL HONG; AGGIE WU; JACK WU; REX WU; and LAN ZHANG, | |
| Defendants. | |

## I.   __INTRODUCTION__

1.     Plaintiffs were lured by Premier Financial Alliance into a pyramid scheme to sell universal life insurance policies.  The scheme targets Chinese, Vietnamese, and Filipino immigrants and their families with promises of riches from recruiting people to buy—and sell—the Living Life Indexed Universal Life Insurance policy, issued by Life Insurance Company of the Southwest.  Although prospective associates are told they will be able to maintain their own insurance business, the policy bought and sold through the pyramid is significantly overpriced.  Premier Financial Alliance instructed Plaintiffs and continues to instruct other "associates" to peddle this policy to other people who, in turn, are instructed to sign up more associates, and so on and so on, *ad infinitum*.  Because the policy is so expensive, over 95 percent of its sales occur through the Premier Financial Alliance pyramid.

2.     Defendants entice victims with a series of fraudulent statements and omissions.  At "financial opportunity" seminars and during junkets in Mexico, Las Vegas, and various exotic locations, Premier Financial Alliance falsely portrays the insurance product as superior and impresses upon potential recruits that joining the group will lead to financial success and independence in their new lives in United States.  Premier Financial Alliance does not disclose that money from new recruits will be used to enrich those at the top of the chain, or that there is a risk the enterprise will collapse if the supply of new recruits dries up.  Life Insurance Company of the Southwest and its corporate parent, National Life Insurance Company, have close ties to Premier Financial Alliance, participate in the scheme to defraud by issuing the underlying policies, and benefit from the conspiracy by collecting insurance premiums and surrender charges.

3.     Plaintiffs bring this action to put a stop to Defendants' predatory behavior and obtain a fair recovery for themselves and the other victims of this pyramid scheme.

## II.   __JURISDICTION AND VENUE__

4.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of

1

interest, attorneys' fees, and costs; and (3) Plaintiffs and Defendants are domiciled in different states.

5.     This Court has personal jurisdiction over Premier Financial Alliance, Inc. and its CEO (David Carroll), CFO and COO (Steven Early), Executive Chairman (Jack Wu), and Executive Field Directors (Hermie Bacus, Bill Hong, Aggie Wu, Rex Wu, and Lan Zhang). Premier Financial Alliance maintains more than half of its franchise offices in California, including in this District, and conducts seminars and promotes itself and the sale of Life Insurance Company of the Southwest policies in this District.  Premier Financial Alliance and the aforementioned Individual Defendants have sufficient minimum contacts with California to render the exercise of jurisdiction by this Court proper and fair.  Each of Premier Financial Alliance's Executive Field Directors resides in and conducts his or her business from California.

6.     The Court has personal jurisdiction over Life Insurance Company of the Southwest, National Life Insurance Company, and Mehran Assadi because they used Premier Financial Alliance as an agent and instrumentality to sell thousands of their insurance policies to Premier Financial Alliance associates.  A substantial proportion of those sales occurred in California.  Life Insurance Company of the Southwest issued the Premier Financial Alliance-branded policies that were sold to Premier Financial Alliance associates, and Premier Financial Alliance associates—including Plaintiffs—became National Life Group agents through their purchase of the policies and participation in the Premier Financial Alliance pyramid scheme. Assadi is the chairman, CEO, and president of National Life Group—a trade name encompassing various affiliates, including Life Insurance Company of the Southwest and National Life Insurance Company.  Assadi worked directly with Premier Financial Alliance to sell life insurance policies to Premier Financial Alliance associates, including by promoting Premier Financial Alliance and the Life Insurance Company of the Southwest policies at numerous Premier Financial Alliance conferences.  Plaintiffs' claims against Life Insurance Company of the Southwest, National Life Insurance Company, and Assadi are meaningfully connected to California: These Defendants partnered with Premier Financial Alliance—a

CLASS ACTION COMPLAINT
CASE NO.

pyramid scheme predominantly promoted from California—to sell life insurance pursuant to the misrepresentations and omissions set forth in this complaint.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.    PARTIES AND RELEVANT NONPARTIES

### A.    Plaintiffs

8.    Plaintiff Youxiang Eileen Wang ("Wang") is and at all relevant times was a citizen and resident of New Jersey.

9.    Plaintiff Biyun Zong ("Zong") is and at all relevant times was a citizen and resident of New Jersey.

### B.    National Life Group Defendants

10.    Defendant Life Insurance Company of the Southwest is a Texas corporation registered with the California Secretary of State.  Defendant Life Insurance Company of the Southwest—a wholly owned subsidiary of Defendant National Life Insurance Company—maintains its principal executive offices at One National Life Drive in Montpelier, Vermont.

11.    Defendant National Life Insurance Company is a Vermont corporation registered with the California Secretary of State and also maintains its principal executive offices at One National Life Drive in Montpelier, Vermont.

12.    Together, Defendants Life Insurance Company of the Southwest and National Life Insurance Company operate under the trade name National Life Group.  Premier Financial Alliance associates are told that, if they meet their sales targets and become a licensed insurance agent, they will be acting as agents of National Life Group.

13.    Defendant Mehran Assadi is Chairman, Chief Executive Officer, and President of National Life Group.  Assadi resides in Vermont.

### C.    Premier Financial Alliance Defendants

14.    Premier Financial Alliance, Inc. was formed as a California corporation and maintained its principal executive offices at 25115 Avenue Stanford in Valencia, California. Premier Financial Alliance now exists as a Georgia corporation and maintains its principal

CLASS ACTION COMPLAINT
CASE NO.

executive offices at 4411 Suwanee Dam Road in Suwanee, Georgia.  Premier Financial Alliance continues to conduct a majority of its business from its California offices, including from its offices in Brisbane.

15.    Defendant David Carroll is Premier Financial Alliance's founder and Chief Executive Officer.  Carroll resides in Georgia.

16.    Defendant Steven G. Early is Premier Financial Alliance's Chief Financial Officer and Chief Operating Officer.  Early resides in Georgia.

17.    Defendant Jack Wu is Premier Financial Alliance's Executive Chairman.  Jack Wu resides in California.

18.    Defendant Hermie Bacus is a Senior Executive Field Director at Premier Financial Alliance—the highest level a Premier Financial Alliance member can attain.  Bacus resides in California.

19.    Defendant Bill Hong is an Executive Field Director at Premier Financial Alliance—the second highest level a Premier Financial Alliance member can attain.  Hong resides in California.

20.    Defendant Aggie Wu is an Executive Field Director at Premier Financial Alliance.  Aggie Wu resides in California.

21.    Defendant Rex Wu is an Executive Field Director at Premier Financial Alliance.  Rex Wu resides in California.

22.    Defendant Lan Zhang is a Senior Executive Director at Premier Financial Alliance.  Zhang resides in California.

23.    The foregoing individuals, together with Defendant Assadi, are referred to herein as the "Individual Defendants."

**D.    Relevant Nonparties**

24.    NLV Financial Corporation is a Delaware corporation and maintains its principal office business address at One National Life Drive in Montpelier, Vermont.  NLV Financial Corporation is the corporate parent of Defendant National Life Insurance Company.  Defendant Assadi is the President of NLV Financial Corporation.

25.    The Consortium Group, LLC is a Georgia limited liability company and has a principal office address at 4865 North River Drive in Cumming, Georgia.  It also has a registered office address at 4411 Suwanee Dam Road in Georgia.  The Consortium Group, LLC wholly owns Defendant Premier Financial Alliance.

26.    The Consortium Group, LLC is owned by nonparties New World Trust and Early Bird Trust.  Defendant Carroll is the sole trustee of New World Trust.  Defendant Early is the sole trustee of Early Bird Trust.

27.    First Financial Security, Inc. is a Delaware corporation with a principal office address at 3550 Engineering Drive in Norcross, Georgia.  Like Premier Financial Alliance, First Financial operates as a National Life Group agent to market and sell National Life universal life insurance policies.

28.    FRA Financial Group is an Illinois limited liability company with a principal office address at 805 West Highway 50 in O'Fallon, Illinois.  Like Premier Financial Alliance and First Financial, FRA Financial operates as a National Life Group agent to market and sell National Life universal life insurance policies.

29.    While the relevant nonparties mentioned above are not being named as defendants in this action at this time, Plaintiffs reserve the right to amend to name relevant nonparties as defendants.

## IV.    <u>OVERVIEW OF PYRAMID SCHEMES</u>

30.    Defendants operate under a multilevel marketing business model.  In a legitimate MLM, distributors earn money primarily through direct sales of products to customers.  Secondarily, distributors also have an incentive to recruit new distributors, as they are promised a percentage of their recruits' sales.  Such recruits are known as a distributor's "downline," and the distributor is known as a recruit's "upline."

31.    An illegal "pyramid scheme," like that perpetrated by Defendants, takes advantage of the public by pretending to engage in legitimate multilevel marketing while actually siphoning off money from new recruits to pay the people at the top level.  The Federal Trade Commission explains that, with a pyramid scheme, "the money you make is based

CLASS ACTION COMPLAINT
CASE NO.

primarily on the number of distributors you recruit and your sales to them, rather than on your sales to people outside the plan who intend to use the products."

32.    Similar to a chain letter, a pyramid scheme disappoints those at the bottom who can find no recruits.  Because it must eventually collapse, a pyramid scheme is inherently fraudulent.

33.    The FTC notes that "[i]f the money you make is based on your sales to the public, it may be a legitimate multilevel marketing plan.  If the money you make is based on the number of people you recruit and your sales to them, it's not.  It's a pyramid scheme.  Pyramid schemes are illegal, and the vast majority of participants lose money."

34.    Dr. Peter J. Vander Nat, a Senior FTC Economist and an expert witness for the agency in pyramid cases, defined a pyramid scheme as follows:

> If an organization sells goods or services to the public and the participants in the organization obtain monetary benefits from (1) recruiting new members and (2) selling the organization's goods and services to consumers, the organization is deemed a pyramid scheme if the participants obtain their monetary benefits primarily from recruitment rather than the sale of goods and services to consumers.

35.    That some retail sales may occur does not mitigate the unlawful nature of a pyramid scheme.

36.    Another indication of a pyramid scheme, according to the FTC, is that "[t]he recruitment pitch says you'll be living in the lap of luxury.  It fails to tell you most people in a pyramid scheme lose money."

37.    Further, the products offered as part of a pyramid scheme typically "are overpriced, have questionable merits, or are downright unsafe to use."

38.    The FTC asks three questions to determine whether an MLM is an unlawful pyramid scheme:

- Do distributors sell more product to other distributors than they do to the public?

CLASS ACTION COMPLAINT
CASE NO.

- Does the amount of money distributors make depend more on recruiting (that is, getting new distributors to pay for the right to participate in the plan)?
- Does the money made depend mostly on selling to other distributors than on sales of the product to the public?

39.     With regard to Defendants' business model, the answer to each of these questions is "yes."

## V.     FACTS

### A.     Defendants' Fraudulent Business Model

#### 1.     National Life Group, Through its Affiliate, Defendant Life Insurance Company of the Southwest, Sells a Complex Life Insurance Product Through Premier Financial Alliance

40.     Life Insurance Company of the Southwest issues universal life insurance policies.  It relies on Premier Financial Alliance to market and sell a universal life insurance policy branded as Living Life Indexed Universal Life.

41.     National Life Group specially designed the Living Life IUL policies for Premier Financial Alliance.  The policies are co-branded by National Life Group and Premier Financial Alliance.  The below image appears at the top of Living Life IUL policy illustrations provided to prospective purchasers, including Plaintiffs.







42.     The Living Life IUL policies state that Premier Financial Alliance is an "agency of Life Insurance Company of the Southwest."

43.     A universal life insurance policy differs from a whole or term life insurance policy in that, in addition to a death benefit, it provides an investment, savings, or interest-bearing component.  The investment component typically accumulates over time.  Because, however, the cost of insurance (based on actuarial factors) increases as an insured ages, the

7

accumulated cash value may be applied to cover increased premiums during the insured's final years.

44.     The cost of insurance—a defined term in the policies—is one of the most important measures of how much a universal life insurance policy will cost to keep in force. The cost of insurance charge is typically the highest expense a policyholder pays.  Further, the cost of insurance charge is deducted from the investment component of the policy, so the policyholder forfeits this charge entirely to National Life Group.

45.     National Life Group offers universal life insurance policies through traditional marketing and sales channels as well as through the Premier Financial Alliance pyramid.

46.     The Living Life IUL policy that Life Insurance Company of the Southwest issues to Premier Financial Alliance associates is offered only through the Premier Financial Alliance network.  And Premier Financial Alliance associates who become licensed insurance agents are only allowed to sell the Living Life IUL policy.

47.     National Life Group does not offer the Living Life IUL policy through traditional insurance marketing and sales channels.  Premier Financial Alliance and National Life's co-branded marketing materials make clear that the Living Life IUL policies are "exclusively distributed by Premier Financial Alliance, Inc."

48.     The Living Life IUL policy that Life Insurance Company of the Southwest issues to Premier Financial Alliance associates is priced substantially higher and offers inferior terms in comparison to the universal life insurance policies that Life Insurance Company of the Southwest offers through traditional insurance marketing and sales channels.  *See infra* ¶¶ 63-64.

### 2.     Premier Financial Alliance Is a Pyramid Scheme

49.     Individual Defendants Carroll and Early control Premier Financial Alliance.

50.     Premier Financial Alliance's representations—made directly and through high-level participants in the scheme, including Individual Defendants Carroll, Bacus, Hong, Zhang, and Aggie, Jack, and Rex Wu—demonstrate that it is a pyramid scheme.

CLASS ACTION COMPLAINT
CASE NO.

51.     That some of the representations provided as examples in this complaint were made by Premier Financial Alliance executives or high-level associates does not insulate Premier Financial Alliance from liability for its fraudulent messaging.  Premier Financial Alliance's Associate Marketing Agreement states that Premier Financial Alliance dictates the terms of all outward-facing content:

- **Advertising**: "All content an associate has produced/created for advertising and sales promotion materials in whatever format whether printed, electronic, photographic, or video, must be pre-approved before first use by PFA's Compliance Officer . . . . [E]ach piece of advertising or marketing material must be approved for its intended use, each time, PIOR to use."

- **Social Media:** "Associates are not allowed to post on their own web pages on any URL, social media website or blog using the name of PFA, its principles, or the name of PFA's preferred product providers or their products without prior approval."

- **Presentations, Seminars, and Meetings:** "Any presentation, seminar or meeting held by a PFA associate for the purposes of: (1) recruiting new PFA associates; (2) for training PFA associates; or for selling an insurance product offered by of [sic] PFA's preferred product providers, shall be subject to Paragraph VII [granting PFA pre-approval authority]."

### a.     How the Pyramid Works

52.     Premier Financial Alliance attracts associates by telling people they can earn millions of dollars by selling National Life Group insurance policies.

53.     After paying an initial membership fee of $125, but before becoming licensed insurance agents, Premier Financial Alliance associates are required to buy the Living Life IUL policy.  Premier Financial Alliance associates are not offered competing policies when they are instructed to purchase the Living Life IUL policies.

54.     Premier Financial Alliance associates are given only one route for progressing up the pyramid: buy the Living Life IUL policy and recruit more associates who in turn must do

the same.  The following graphic—taken from a Premier Financial Alliance presentation to Premier Financial Alliance associates—depicts the path that associates must take to progress up this pyramid:



55.     Once they pay the $125 membership fee and buy the Living Life IUL policy, Premier Financial Alliance associates are pressured to recruit and sell the policy within their network of friends and family members, typically from the same immigrant group.

56.     In a key step called "5-5-30," each new Premier Financial Alliance associate is directed within 30 days to enroll five people to become Premier Financial Alliance associates and sell five Living Life IUL policies.  For purposes of the latter requirement—the sales quota—the associate's own purchase of a Living Life IUL policy counts, as do such purchases for immediate family members.  If, for example, an associate has a wife and three children, his purchase of policies for his family meets the initial sales quota.

57.     After satisfying 5-5-30, the associate is then permitted to apply for a license to sell insurance.  Once the associate completes three more supervised sales, he or she is then permitted to progress up the pyramid based on how many additional sales of the Living Life IUL policy the associate makes.  Prospective associates are not told that because this policy is

CLASS ACTION COMPLAINT
CASE NO.

1    so expensive, the only way to satisfy their sales targets is to recruit more PFA associates who

2    will purchase (and sell) the policy in order to participate in the multilevel marketing scheme.

3         58.    As shown in the Premier Financial Alliance image below, as an associate makes

4    his or her way up the pyramid, he or she receives greater commissions.

## PFA REVOLUTIONARY BUILDERS COMPENSATION

| BASE SHOP LEVELS | PERSONAL COMMISSION | BUILDER'S TRACK | PERSONAL TRACK |
|---|---|---|---|
| **CA** Career Associate | 30% | 3 Training Sales of minimum 9,000 target points and 3 Personal Recruits | |
| **FA** Field Associate | 45% | 25,000 cumulative team points[1] plus 3 team LFTRs[2] | 3/3/30[3] |
| **SA** Senior Associate | 55% | 50,000 cumulative team points plus 5 team LFTRs | 5/5/30[4] |
| **PFD** Provisional Field Director | 60% | 75,000 cumulative team points plus 7 team LFTRs | 100,000 personal points (min 15 sales & PR[5] 78%) in 12 rolling months |

| DIRECTOR LEVELS | PERSONAL COMMISSION | BUILDER'S TRACK | PERSONAL TRACK |
|---|---|---|---|
| **QFD[8]** Qualified Field Director | 70% | 125,000 AV[6] Team Points and 3 Direct Producing Legs[7] in 3 Rolling Calendar Months. | 180,000 personal points (min 30 sales & PR 78%) in 12 rolling months |
| **SFD** Senior Field Director | 75% | 200,000 AV Team Points and 4 Direct Producing Legs in 3 Rolling Calendar Months. | 250,000 personal points (min 40 sales & PR 78%) in 12 rolling months |
| **RFD** Regional Field Director | 77% | 325,000 AV Team Points and 5 Direct Producing Legs in 3 Rolling Calendar Months. | 320,000 personal points (min 50 sales & PR 78%) in 12 rolling months |
| **AFD** Area Field Director | 79% | 450,000 AV Team Points and 6 Direct Producing Legs in 3 Rolling Calendar Months. | |
| **NFD** National Field Director | 81% | 600,000 AV Team Points and 7 Direct Producing Legs in 3 Rolling Calendar Months. | |
| **EFD** Executive Field Director | 83% | 1,000,000 AV Team Points and 8 Direct Producing Legs in 3 Rolling Calendar Months. | |
| **SEFD** Senior Executive Field Director | 83% | 3,500,000 AV Team Points and 9 Direct Producing Legs[7] in 3 Rolling Calendar Months. | |

         **b.    Each of the Hallmarks of a Pyramid Scheme Is Present**

         59.    Premier Financial Alliance targets new Chinese, Vietnamese, and Filipino

immigrant communities.  The Securities and Exchange Commission characterizes this sort of

targeted scam as "affinity fraud"—a recurring form of fraud that "prey[s] upon members of

identifiable groups, such as religious or ethnic communities."  The "scams exploit the trust and

friendship that exist in groups of people who have something in common," the SEC notes.

11

CLASS ACTION COMPLAINT
CASE NO.

60.    **Premier Financial Alliance associates earn money by recruiting, not based on their sales to the public.**  Because the Living Life IUL policies are far more expensive than National Life Group's non-Premier Financial Alliance policy alternatives, Premier Financial Alliance agents are unable to sell these Living Life IUL policies outside of the Premier Financial Alliance pyramid.

61.    Premier Financial Alliance devotes the overwhelming majority of its training efforts to extolling the merits of moving up the pyramid as quickly as possible to generate a "downline" organization from which profit will flow upward.  In training existing associates, therefore, Premier Financial Alliance seeks to enlist them to convince other prospects of the virtues of selling still other people on the Premier Financial Alliance program, in an endless recruitment chain.  Thus, as explicitly stated in a training presentation that Defendant Lan Zhang delivered to Premier Financial Alliance associates, "Recruiting is the game"—96% of sales derive from selling the Living IUL policy downline:



62.    Premier Financial Alliance's emphasis on recruiting pervades its training materials for associates, who have already paid the initial $125 fee.  Those materials include the following statements:

12

- "Recruiting is your daily job!  You Get Paid By RECRUIT!  You Must have Recruiter's Mindset[.]  Recruit Where you go!  Recruiting is a process, not an event.  If you are not rejected on daily basis, your dream is not big enough."
- "No Recruit, No Team, No Residual Income[.]  More Recruit, Bigger Team, More Income. . . . Recruit / Team building makes you wealthy."
- "You are in the relationship business[.]  You must recruit warm market[.]  Recruit your family and get support.  Recruit Your friends, your friends' friends."
- "When you recruit someone do two things: First share your goals.  Let them know they are dealing with a leader who's going someplace.  Second, help them set their goals – then help them accomplish them."
-  "Recruiting…never stops!"
- "You must commit to running a system whereby recruiting never stops."

63.    **The Insurance Product Being Sold Is Overpriced.**  The cost of insurance for the Living Life IUL policies sold through the Premier Financial Alliance pyramid substantially exceeds the cost of insurance for comparable policies.

64.    The table below compares illustrative cost of insurance rates (COI) for the Living Life IUL policy to the corresponding rates for National Life Group's FlexLife II Indexed Universal Life Insurance policy, which provides the same death benefit, for a 44-year-old female insured over time.

| Age | Living Life IUL COI | FlexLife II COI |
|-----|---------------------|-----------------|
| 44  | $954                | $231            |
| 48  | $1,291              | $625            |
| 53  | $2,005              | $1,300          |
| 58  | $2,883              | $1,883          |
| 63  | $4,113              | $2,659          |
| 68  | $6,100              | $4,851          |
| 73  | $8,883              | $7,749          |

13

CLASS ACTION COMPLAINT
CASE NO.

Even though the two policies provide the same $1 million death benefit, the cost of insurance for the Premier Financial Alliance policy exceeds the cost of insurance for the non-Premier Financial Alliance policy at each age.

65.     An associate's ability to recruit new associates, as opposed to selling these policies to non-associates, is what drives the ability to succeed in the Premier Financial Alliance enterprise.

66.     **Premier Financial Alliance Falsely Claims That Participation Is Low Risk and Will Lead to Wealth.**  On Premier Financial Alliance's website, on the Individual Defendants' social media pages, and in YouTube videos, Premier Financial Alliance and Individual Defendants represent that becoming an agent and progressing up through the pyramid leads to personal wealth and success.

67.     Premier Financial Alliance states on its website that it provides people "from all walks of life the opportunity to start their own business and gain the financial freedom to live their dreams."  Participating in Premier Financial Alliance's program, its website represents, enables a person to: (1) "Become Your Own Boss"; (2) "Control Your Own Destiny"; (3) "Build Your Own Business Without Risk"; (4) "Become a Leader in Your Community"; (5) "Get Paid What You Are Worth"; (6) "Achieve Profitable Results Right Away"; and (7) "Build Financial Independence."

68.     In presentation materials and throughout its online and social media presence, Premier Financial Alliance also advertises that participation enables associates to afford luxury living.  For example, Premier Financial Alliance represents or has represented:

- "At PFA, we are delivering on your dreams.  Our top producers travel the World on us."

- "From a humble beginning . . . to a successful entrepreneur and a leader today, Executive Chairman Jack Wu is helping thousands of people . . . ."

- "I [Bill Hong] made $130,000 the first year I was licensed at the age of 25.  At the age of 26, my annual income was $250,000 and at the age of 27 – $650,000. Now, at the age of 28 years old, my annual income is $1,000,000.00 the last 12

CLASS ACTION COMPLAINT
CASE NO.

months.  I am also the youngest Executive Field Director in the company and the youngest millionaire in the company."

- "AGGIE WU was close to graduating when the PFA opportunity came knocking. She knew that as soon as she graduated, she had 2 choices – either join the corporate world of 8 am to 5 pm OR become entrepreneur where you work hard now and make time to live life to the fullest."

- "Today we CONGRATULATE HERMIE BACUS on EARNING his NINTH (9th) DIAMOND on the MILLION DOLLAR RING!  That's right … in the last 12 months, Hermie made $900,000 in income!  Congratulations Hermie!"

69.    Similarly, Defendant Carroll represented that those who master the principle of leadership in Premier Financial Alliance "hold the keys to unlock the secrets of wealth."

70.    The luxuries made available to associates are a consistent and pervasive theme in Premier Financial Alliance presentations, including those made by Individual Defendants:



CLASS ACTION COMPLAINT
CASE NO.

71.    In a Premier Financial Alliance video entitled "How to Win the Money Game," Defendant Rex Wu specifies the steps through which associates will progress to realize personal wealth. According to Wu, "[o]nce you get licensed and start building your business," associates will earn between $1,650 (for one sale a month) and $6,600 (for four sales a month). Advertising "Revolutionary Compensation," Wu states that growing one's business will lead to earnings of *$100,000 or more a month*. "Your income is unlimited because the size of the team is unlimited," Wu explains.

72.    In a video entitled "Premier Financial Alliance: Millionaires Journey," Defendants Jack Wu and Lan Zhang describe the personal wealth they amassed through Premier Financial Alliance; Zhang earned "$2 million in commission over the last rolling 12 months."

73.    Premier Financial Alliance lures in associates with images of glamour, opulent travel to exotic locations, fancy cars, and ostentatious attire, even people wearing crowns. With these and other images, and rags-to-riches tales, the Premier Financial Alliance message is clear: pay the membership fee, buy the policy, recruit five associates, become an agent, recruit more associates—and you'll get rich.



Leadership Edge - Special Edition | Lan Zhang

16

**c.      Defendants' Representations Are Fraudulent**

74.    Premier Financial Alliance is a quintessential pyramid scheme—each associate pays money to the company and in turn receives the rights to (1) sell the Living Life IUL policy, (2) gain rewards for recruiting other participants into the scheme, and (3) earn commissions when persons introduced into the scheme recruit yet more new participants. Insurance sales are of secondary importance to recruitment efforts in this endless chain fraud. The profits Premier Financial Alliance associates hope to earn by buying the membership and policy, and by recruiting others to do the same, depend on a continuing supply of new recruits who in turn bring on yet more new recruits.

75.    The statements, representations, images, and omissions that Premier Financial Alliance and the Individual Defendants use to recruit new members into their scheme are fraudulent.

76.    Prospective associates are not informed at sign-up that the Living Life IUL policy is overpriced or that the only way they will be able to succeed in the Premier Financial Alliance is by recruiting a steady stream of associates (starting with family and friends) to buy the same overpriced product.  Instead, Premier Financial Alliance tells its potential customers that "[a]s a PFA associate you will be in business for yourself" selling a competitive financial services product.  Carroll stresses publicly that the company is in the life insurance business and "on a crusade, a mission to educate Americans about life insurance with living benefits. What separates us from the competition?  A relatively unknown set of insurance products that are the greatest financial products in the market today."

77.    Images of personal wealth pervade Premier Financial Alliance's marketing.  Yet the luxuries flaunted by Abbie, Jack and Rex Wu, Lan Zhang, and Hermie Bacus are earned at the expense of those lower down in the pyramid.  Premier Financial Alliance does not inform its prospective associates of the fact that nearly all of the profit from their sales of insurance policies will go to the Individual Defendants at the pyramid's apex.  Nor does Premier Financial Alliance disclose that when and if recruiting dries up—which is inevitable given the absence of a retail market for the policy—the entire pyramid will crumble.  By the time

17

CLASS ACTION COMPLAINT
CASE NO.

associates realize they stand no meaningful chance of profiting in Defendants' enterprise, associates will have paid thousands of dollars in premiums for their (overpriced) National Life Group Living Life IUL policies.

78.    Premier Financial Alliance's fraud has succeeded.  Within the first six months of selling the Living Life IUS policy, over $1.3 billion in face value of the policies were issued. Tens of thousands of associates have been recruited into the Premier Financial Alliance. Though all are sold on the likelihood of making a large amount of money, only the few at the top profit.

### B.    NLG Ratified and Benefited From the Fraud

79.    Defendants National Life Insurance Company, Life Insurance Company of the Southwest, and Assadi are the driving force behind the Premier Financial Alliance pyramid scheme.  The scheme exists for two reasons: (1) to enrich Carroll, Early, and those at the top of the pyramid; and (2) to sell an overpriced universal life insurance policy, which would not and could not be sold without the false promise of achieving an entrepreneurial dream, for the financial benefit of National Life Insurance Company, Life Insurance Company of the Southwest, and Assadi.

80.    The Living Life IUL policy is co-branded by National Life Group and Premier Financial Alliance.

81.    The policy explicitly refers to Premier Financial Alliance as being an agent of National Life Group.  Premier Financial Alliance is National Life Group's top-selling agent.

82.    Assadi is a regular attendee and presenter at Premier Financial Alliance's conferences.  He has attended and spoken at its conventions in Las Vegas, New Orleans, Orlando, and San Antonio for years.

83.    During Premiere Financial Alliance's 2019 conference in San Antonio, Assadi, alone onstage, led Premier Financial associates in chants of "we are number 1!"  The below images show Assadi at this recent convention, at which the Premier Financial Alliance-National Life Group partnership was described as "A Winning Team":

CLASS ACTION COMPLAINT
CASE NO.







84.    In the second image above, entitled "A Winning Team," Assadi stands on the right with Carroll to his immediate left.

CLASS ACTION COMPLAINT
CASE NO.

85.    Premier Financial Alliance, for its part, makes clear that National Life Group prepared certain of its training materials and that all presentation materials—including those provided by Assadi—"are pre-approved by PFA Compliance."

86.    When Premier Financial Alliance associates become insurance agents, they "get appointed with NLG/LSW" to sell insurance, and receive online product training from National Life Group.

87.    Assadi—like Carroll and the other Individual Defendants—evangelizes about the benefits of National Life online, including on Premier Financial Alliance-affiliated Facebook pages.

88.    Like the other Individual Defendants, Assadi's promotional pitches focus on financial opportunity, and the need to recruit and retain "producers," far more than on the merits of the life insurance his company offers.  Assadi's promotion pitches include the statements below.  Each is false and misleading.

- "It's about huge dreams."
- "The idea is find your passion and make that passion a commitment.  Be part of something that's special. . . . [P]eople like to respond to a higher calling.  Be part of something that has meaning behind it.  It's about potential recruits, it's about clients, it's about people who are already part of the organizations."
- "Our field organization, 25,000 producers strong, have bought into the concept of educating and serving middle America."
- "Products can get copied, but the service and the way we care about our clients and our producers is something that is the secret sauce that belongs to this company."

89.    National Life Group has experienced explosive growth since initiating its relationship with Premier Financial Alliance, doubling annuity and life insurance sales from 2012 to 2017.  According to Defendant Assadi, "National Life's growth is staggering: In the past decade our life and annuity sales have grown over 90 percent; our core earnings have grown over 80 percent, and the number of policies in force has increased 60 percent.  The face

value of our insurance in force is more than $120 billion.  In 2017 one life or annuity policy came through our door each and every minute, 88 per hour and 707 per day."

90.     Life Insurance Company of the Southwest issued every Living Life IUL policy sold through the Premier Financial Alliance network.

91.     National Life Group, including specifically Life Insurance Company of the Southwest and National Life Insurance Company, benefits from Premier Financial Alliance's fraud.  National Life Group gains revenues from payments of premiums on policies sold through the pyramid scheme.  Absent the scheme, National Life Group would not be able to sell these policies, because they are not competitively priced.

92.     When these policies lapse because insureds stop paying premiums, National Life Group retains all premiums paid on the policies, as well as surrender charges, without paying out any benefits, thereby gaining a windfall.

## VI.    PLAINTIFF-SPECIFIC ALLEGATIONS

### A.    Plaintiff Youxiang Eileen Wang

93.     Eileen Wang paid $125 to become a Premier Financial Alliance associate on November 8, 2017.  She purchased a Living Life IUL policy through Premier Financial Alliance on December 13, 2017.  She also purchased a policy for her husband, David Xie, on November 9, 2017.

94.      Prior to purchasing her membership and policy, Ms. Wang saw representations of Premier Financial Alliance and Individual Defendants, including that (1) by paying $125, purchasing the policy, and moving up through the ranks, she would become an independent insurance agent and sell quality life insurance policies to the public, and that (2) once she became an insurance agent, she would realize personal financial success.

95.     Defendants never advised Ms. Wang that the Living Life IUL policy is overpriced as compared to competing products, or that the only way to succeed in the Premier Financial Alliance is by recruiting new members and convincing them to buy the same product.  Had Defendants disclosed the true nature of the Living Life IUL policy, Ms. Wang would not have purchased this policy or joined the Premier Financial Alliance network.  Had Ms. Wang known

CLASS ACTION COMPLAINT
CASE NO.

that Premier Financial Alliance, backed by National Life Group, was running an illegal pyramid scheme, she would not have purchased a Living Life IUL policy or joined the Premier Financial Alliance network.

### B.    Plaintiff Biyun Zong

96.    Biyun Zong paid $125 to become a Premier Financial Alliance associate on May 21, 2016.  She purchased a Living Life IUL policy through Premier Financial Alliance on July 18, 2016.  She also purchased a policy for her son, Tao Eustaquio, on the same day.

97.     Prior to purchasing her membership and policy, Ms. Zong saw representations of Premier Financial Alliance and Individual Defendants, including that (1) by paying $125, purchasing the policy, and moving up through the ranks, she would become an independent insurance agent and sell quality life insurance policies to the public, and that (2) once she became an insurance agent, she would realize personal financial success.

98.    Defendants never advised Ms. Zong that the Living Life IUL policy is overpriced as compared to competing products, or that the only way to succeed in the Premier Financial Alliance is by recruiting new members and convincing them to buy the same product.  Had Defendants disclosed the true nature of the Living Life IUL policy, Ms. Zong would not have purchased this policy or joined the Premier Financial Alliance network.  Had Ms. Zong known that Premier Financial Alliance, backed by National Life Group, was running an illegal pyramid scheme, she would not have purchased a Living Life IUL policy or joined the Premier Financial Alliance network.

## VII.    AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS

99.    At all relevant times, each Defendant and each Relevant Non-Party was a principal, agent, alter ego, joint venturer, partner, or affiliate of each Defendant and each of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Each Defendant and each Relevant Non-Party had actual knowledge of the wrongful acts of each Defendant and each of the other Relevant Non-Parties; ratified, approved, joined in,

acquiesced, or authorized the wrongful acts of each Defendant and each of the other Relevant Non-Parties; and retained the benefits of those wrongful acts.

100.   Defendants Premier Financial Alliance, Inc. and Life Insurance Company of the Southwest, the Individual Defendants, and each Relevant Non-Party aided and abetted, encouraged, and rendered substantial assistance to Defendants and each of the other Relevant Non-Parties in perpetrating their fraudulent scheme on Plaintiffs and the class.  In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Defendants and each Relevant Non-Party acted with an awareness of its primary wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

## VIII.   TOLLING OF THE STATUTES OF LIMITATION

101.   At all relevant times, Defendants Premier Financial Alliance, Inc., Life Insurance Company of the Southwest, and National Life Insurance Company, and the Individual Defendants knew that their scheme was an unlawful pyramid scheme and that Plaintiffs and the class did not have that knowledge.  Despite reasonable diligence on their part, Plaintiffs and class members were kept ignorant by Defendants of the factual bases for these claims for relief.

102.   Defendants Premier Financial Alliance, Inc., Life Insurance Company of the Southwest, and National Life Insurance Company, and the Individual Defendants fraudulently concealed their pyramid scheme by touting it as a promising financial opportunity while failing to divulge its true nature.  Defendants' fraudulent misrepresentations set forth above had the effect of concealing that Defendants were operating an unlawful pyramid scheme.

103.   Plaintiffs and class members reasonably relied to their detriment on Defendants' fraudulent concealment of their violations.  As a result of this concealment, Plaintiffs and class members did not believe that it was necessary to file a lawsuit.

104.   Plaintiffs and class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Defendants' violations or the harm caused thereby until suit was brought, on June 25, 2018.  Thus, because Plaintiffs could not

have reasonably discovered the facts constituting Defendants' violations until June 25, 2018, all applicable statutes of limitation were tolled until then.

## IX. <u>CLASS ACTION ALLEGATIONS</u>

105.    Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of a class of all persons in the United States who enrolled in or purchased a National Life Group universal life insurance policy from Premier Financial Alliance or from any similar multilevel marketing organization.

106.    Excluded from the class are Defendants Premier Financial Alliance, Inc., Life Insurance Company of the Southwest, and National Life Insurance Company, their parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which one of these Defendants has a controlling interest or which has a controlling interest in one of these Defendants, and the Relevant Non-Parties listed above. Also excluded from this class are the Individual Defendants, their agents, legal representatives, successors, assigns, and immediate family members, and the judicial officers to whom this matter is assigned and their immediate family members.

107.    <u>Numerosity</u>.  The class members are too numerous to be practicably joined.  The class members are identifiable from information and records in Defendants' possession, custody, or control.  Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

108.    <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of other members of the class.  Plaintiffs and each class member enrolled in or purchased a life insurance policy from Premier Financial Alliance and were subject to the wrongful conduct alleged in this complaint.

109.    <u>Adequacy of Representation</u>.  Plaintiffs are members of the class and will fairly and adequately represent and protect its interests.  Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

CLASS ACTION COMPLAINT
CASE NO.

110.   Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation, including cases involving pyramid schemes, and will pursue this action vigorously.

111.   <u>Commonality and Predominance</u>.  Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members.  Among the questions common to the class are:

a.   Whether Premier Financial Alliance's statements and omissions constitute fraud;

b.   Whether Defendants formed an unlawful combination with a common design;

c.   Whether Defendants are operating an endless chain in violation of California law;

d.   Whether Defendants' acts, statements, and omissions violate the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*;

e.   Whether Defendants should be enjoined from continuing to engage in the conduct described herein; and

f.   The amount of damages or restitution owed to Plaintiffs and class members.

112.   <u>Superiority</u>.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.  Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve judicial and party resources, promote efficiency of adjudication, and avoid inconsistent rulings.

113.   <u>Injunctive Relief</u>.  Defendants acted on grounds generally applicable to the class such that injunctive relief is warranted for the class as a whole.

CLASS ACTION COMPLAINT
CASE NO.

X.    **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Fraud**

**(Against Defendants Premier Financial Alliance, Inc., David Carroll, Steven Early, Hermie Bacus, Bill Hong, Aggie Wu, Jack Wu, Rex Wu, and Lan Zhang)**

114.    Plaintiffs reallege the foregoing allegations.

115.    Premier Financial Alliance, on its own, and by and through the Premier Financial Alliance-affiliated Individual Defendants (Carroll, Early, Bacus, Hong, Zhang, and Aggie, Jack, and Rex Wu), made false representations and fraudulent omissions to Plaintiffs. Defendants did so with the intent to deceive Plaintiffs and induce them to act in reliance on its false representations and fraudulent omissions.

116.    Defendants' false and misleading representations included representations that: (a) becoming an associate in Premier Financial Alliance leads to successful work as an insurance agent; (b) once associates became agents, they gain wealth from selling a high-quality, competitive insurance product; and (c) participation in the Premiere Financial Alliance comes with no job risk.  Without limitation, Defendants' false and misleading representations included the following:

a.    "No job risk";

b.    "PFA's products are innovative and specially designed for anticipating the financial needs of individuals throughout their lives";

c.    "PFA will recognize you with everything from custom watches to super bowl style rings to exclusive World Class Trips. Join PFA and See the World!";

d.    "Build your own business without risk";

e.    "Achieve profitable results the right way";

f.    "Achieve Profitable Results Right Away"; and

g.    "[L]everage your talents and abilities so you can begin building your own successful financial services business today."

117.    Premier Financial Alliance, and the Individual Defendants identified in paragraph 115 above, made these and other misrepresentations despite knowing that they were operating an illegal pyramid scheme vulnerable to collapse when and if a continuous adequate supply of new recruits could not be found.

118.    Defendants fraudulently concealed from Plaintiffs the true, illicit nature of the Premier Financial Alliance enterprise and the fact that money obtained from new recruits and policy purchases would be used to enrich those at the top of the chain.  Premier Financial Alliance did not disclose to Plaintiffs that its compensation program—based on payments to participants for purchases of insurance policies by new participants, not for the retail sale of policies—bore the essential hallmark of a pyramid scheme.

119.    Defendants fraudulently concealed, moreover, that the single universal life insurance policy being sold in the pyramid was not competitively priced in relation to comparable insurance products.

120.    Plaintiffs justifiably relied on Defendants' false representations and fraudulent omissions when they bought life insurance from and paid money to Premier Financial Alliance.

121.    Plaintiffs were deceived by, and sustained harm as a direct and proximate result of, Defendants' fraud.

122.    The fraudulent acts and omissions of Premier Financial Alliance, and of the Premier Financial Alliance-affiliated Individual Defendants, showed willful misconduct, malice, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to consequences.

123.    Plaintiffs are therefore entitled to damages—including punitive damages—in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

**Civil Conspiracy**
**(Against All Defendants)**

124.    Plaintiffs reallege the foregoing allegations.

CLASS ACTION COMPLAINT
CASE NO.

125.    Defendants Premier Financial Alliance, Inc., Life Insurance Company of the Southwest, and National Life Insurance Company, and the Individual Defendants engaged in concert of action through a conspiracy to defraud.

126.    Defendants' conspiracy had a common design.  The conspiracy aimed to deceive and profit off of Plaintiffs and others who fell prey to the pyramid scheme directly perpetrated by Premier Financial Alliance and the Premier Financial Alliance-affiliated Individual Defendants identified in paragraph 115 above.

127.    Life Insurance Company of the Southwest, under the supervision and control of National Life Insurance Company, issued the insurance policies sold through the pyramid. Premier Financial Alliance ran the scheme, and the Individual Defendants promoted it with fraudulent misrepresentations.  All Defendants reaped undue financial gain from their conspiracy.

128.    In furtherance of the conspiracy, each Defendant took at least one overt act, including, without limitation, approving or making fraudulent statements to Plaintiffs or issuing insurance policies.

129.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs sustained harm in an amount to be determined at trial.

130.    Defendants are jointly and severally liable for all harm caused by their conspiracy.

131.    Defendants' actions in furtherance of their conspiracy showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to consequences.  Defendants' reprehensible conduct in perpetrating a fraudulent pyramid scheme entitles Plaintiffs to punitive damages.

## THIRD CLAIM FOR RELIEF

**Endless Chain Scheme in Violation of California Penal Code section 327 and California Civil Code section 1689.2**
**(Against All Defendants)**

132.    Plaintiffs reallege the foregoing allegations.

133.    Section 1689.2 of the California Civil Code provides:

CLASS ACTION COMPLAINT
CASE NO.

> A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

134. Defendants, and each of them, contrived, prepared, set up, proposed, or operated an endless chain in violation of Penal Code section 327. Defendants' scheme for the distribution of property—universal life insurance policies—is an unlawful endless chain because participants pay valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

135. Plaintiffs have suffered injury in fact and have lost money or property because of Defendants' operation of an endless chain and their associated business acts, omissions, and practices.

136. Plaintiffs are accordingly entitled to:

   a.    rescind any contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to them under the scheme;

   b.    appropriate restitutionary, compensatory, and consequential damages; and

   c.    reasonable attorneys' fees, costs, and pre- and post-judgment interest.

## FOURTH CLAIM FOR RELIEF

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")
(Against All Defendants)**

137. Plaintiffs reallege the foregoing allegations.

138. The UCL forbids any unlawful, unfair, or fraudulent business act or practice.

139. Defendants act unlawfully in violation of the UCL by perpetrating an endless chain scheme that violates established California law.

140.    Defendants act unfairly in violation of the UCL because their conduct violates the legislatively declared policy against endless schemes.  Defendants' conduct is unfair, predatory, unscrupulous, and substantially injurious.  The gravity of the harm resulting from Defendants' pyramid scheme outweighs any potential utility from the scheme.  There are reasonably available alternatives that would further Defendants' legitimate business interests, such as selling life insurance policies through ordinary channels or under a multilevel marketing model that prioritizes retails sales over recruitment.  The harm from Defendants' unfair conduct is not reasonably avoidable by consumers such as Plaintiffs.

141.    Defendant Premier Financial Alliance, Inc., and the Individual Defendants identified in paragraph 115 above, act fraudulently in violation of the UCL for the reasons stated above in the First Claim for Relief, and because their statements, representations, images, and omissions had the capacity to, and did, mislead Plaintiffs.

142.    Defendants' acts or practices that violate the UCL harm the public at large and form part of a common and uniform course of wrongful conduct.

143.    Plaintiffs suffered injury in fact, and lost money or property, as a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct.  Plaintiffs accordingly seek restitution, a permanent injunction, and reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**

**Violations of the New Jersey Consumer Fraud Act, New Jersey Statutes Ann. 56:8-3, *et seq*.
(Against All Defendants)**

144.    Plaintiffs reallege the foregoing allegations.

145.    Defendants' acts, practices, misrepresentations, and  omissions constitute unconscionable, unlawful, fraudulent, and deceptive commercial practices that violate New Jersey Statutes Ann. 56:8-2.

146.    As is described in the First Claim for Relief, in their marketing and sale of the Living Life IUL policies and Premier Financial Alliance memberships, Premier Financial Alliance, and the Individual Defendants identified at paragraph 115 above, employed unconscionable commercial practices, deception, fraud, misrepresentations, and the knowing

concealment, suppression, and omission of material facts, with the intent that others rely thereon.

147.   As is described in the Second Claim for Relief, the National Life Group Defendants conspired with the Premier Financial Alliance Defendants to market and sell the Living Life IUL policies, and reaped financial benefits from each such sale.  The National Life Group Defendants all actively participated in the fraud: (1) Life Insurance Company of the Southwest issued every one of the Living Life IUL policies sold in the pyramid; (2) National Life Insurance Company (operating under the trade name National Life Group) orchestrated the scheme by allowing Premier Financial Alliance associates to sell only the Living Life IUL policy; and (3) Assadi, in addition to directing and controlling National Life Group as its Chairman, President, and CEO, regularly attends Premier Financial Alliance conventions to extol the benefits of the pyramid scheme itself.

148.   As a direct and proximate result of Defendants' conduct in violation of New Jersey law, Plaintiffs have suffered ascertainable losses.

149.   Under New Jersey Statutes Ann. 56:8-19, Plaintiffs are entitled to treble damages, appropriate injunctive relief, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief in the form of a judgment:

A.   Certifying this action for class treatment, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.   Awarding damages or restitution, including pre-judgment interest, on each count in an amount to be determined at trial;

C.   Imposing punitive damages on Defendants in an amount sufficient to penalize and deter their wrongful conduct;

D.   Enjoining Defendants from continuing to perpetrate their illicit scheme;

E.   Awarding reasonable attorneys' fees and costs of litigation; and

F.   Granting such other relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT
CASE NO.

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.

3

4

Dated:  February 28, 2019

Respectfully submitted,

5

**GIRARD SHARP LLP**

6

/s/ *Daniel C. Girard*

7

Daniel C. Girard (SBN 114826)

8

Jordan Elias (SBN 228731)
Adam E. Polk (SBN 273000)

9

**GIRARD SHARP LLP**

10

601 California Street, Suite 1400
San Francisco, CA 94108

11

Telephone: (415) 981-4800
Facsimile: (415) 981-4846

12

*dgirard@girardsharp.com*

13

*jelias@girardsharp.com*
*apolk@girardsharp.com*

14

*Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO.